UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FSC FRANCHISE CO., LLC,

     Plaintiff,

v.                                      CASE No. 8:09-CV-454-T-23TGW

EXPRESS CORPORATE
APPAREL, LLC, et al.,

     Defendants.

_____

## REPORT AND RECOMMENDATION

The plaintiff has filed a Motion for Final Default Judgment (Doc. 71), seeking a permanent injunction and monetary relief for trademark infringement, breach of contract, and false designation of origin. The plaintiff alleges that the defendants used without authorization its Beef O' Brady's trademarks on corporate apparel and merchandise. The defendants failed to defend this case, and defaults were entered against them.

The well-pled complaint allegations and evidence establish the plaintiff's claims. An evidentiary hearing was held to determine the amount of damages to which the plaintiff was entitled. Based upon the evidence

submitted by the plaintiff, I recommend that judgment be entered for the plaintiff in the amount of $30,742.48, plus attorneys' fees of $39,305, and costs of $560, and that the preliminary injunction be made permanent.

## I.

Plaintiff FSC Franchise Company, LLC ("FSC"), is a Delaware company that franchises Beef O' Brady's Family Sports Pubs restaurants (Doc. 1, ¶1). The business provides food and beverage service to restaurant patrons in a family-oriented atmosphere (id.). The plaintiff owns federally registered trademarks "Beef O' Brady's," "BEEF'S," "A LEAGUE OF ITS OWN," and "O' BRADY'S" (id., ¶6).[1] It uses them to identify its restaurants and for promotion and advertising (Doc. 13, p. 2).

Defendant Express Corporate Apparel, LLC ("Express"), is a Florida company that produces corporate apparel and merchandise (Doc. 1, ¶2; Doc. 13, p. 3). Express's former president, Richard Donahue, who is deceased, signed the parties' Supplier Trademark License Agreement to become a nonexclusive royalty-free licensee to produce uniforms, clothing, and retail items bearing the plaintiff's marks for purchase by the plaintiff's

---

[1] For uniformity, the marks will herein be referred to as Beef O' Brady's.

franchisees (Doc. 1, Ex. 1).  The agreement contained a termination clause which permitted either party to terminate the agreement with, or without, cause upon thirty-days notice to the other party (id., p. 10).

FSC notified Express of its decision to terminate the agreement by letter dated November 24, 2008, to be effective on December 31, 2008 (id., Ex. 2).  In the termination letter, FSC reminded Express and Donahue of their agreement to comply with the post-termination provisions imposed by the agreement (id.).  The letter emphasized that, in the event of termination, the right to use the marks ceased immediately (id.).

The plaintiff subsequently learned that several provisions of the agreement were being violated (Doc. 13, pp. 4-5).  Thus, in February 2009, Donahue contacted Daniel Robillard, the general manager of a Florida Beef O' Brady's franchise, to solicit the sale of merchandise bearing the marks, cautioning Robillard not to reveal their conversation to FSC (Doc. 13-2, pp. 8-9).  Further, Donahue contacted Richard Cleaves, a Kentucky franchisee, and informed him that Express would continue to fill orders for merchandise bearing the marks (id., pp. 10-11).  Additionally, FSC learned that, in

February 2009, the defendants filled orders for merchandise bearing the marks (id., pp. 12-13).

Express also continued to represent to the public that it was affiliated with FSC. Through at least March 6, 2009, the defendants' website marketed the company as an approved licensee of the various Beef O' Brady's marks and utilized the marks as graphics and as metadata (Doc. 1, Ex. 3).

On March 12, 2009, the plaintiff filed this lawsuit asserting claims against the defendants for trademark infringement, breach of contract, and false designation of origin under the Lanham Act (Doc. 1). The plaintiff moved for a preliminary injunction seeking to prohibit the defendants from using the marks (Doc. 13), which was referred to me for a report and recommendation (Doc. 15).

Initially, the defendants participated in the litigation. Thus, the defendants filed a motion to dismiss (which was denied), and then answered the complaint and asserted affirmative defenses and counterclaims (Docs. 11, 16).

However, the defendants failed to oppose the plaintiff's motion for preliminary injunction. After considering its merits, I recommended the entry of a preliminary injunction enjoining the defendants' use of the Beef O' Brady's marks (Doc. 23). The district court adopted that recommendation and entered against Express a preliminary injunction in September 2009, after no objections were filed (see Doc. 39).[2]

Further, the defendants ceased participating in discovery. Thus, the plaintiff alleged in a motion to compel that the defendants' discovery responses were inadequate (Doc. 54). The defendants, however, failed to respond to the motion, or comply with the court's Order to produce the discovery (Docs. 55, 60).

Thereafter, the plaintiff filed a Motion for Sanctions, stating that its prosecution of this case had been prejudiced by the defendants' dilatory conduct (Doc. 60). The plaintiff requested that the defendants' answers, affirmative defenses, and counterclaims be stricken, and for the entry of

---

[2] Due to the defendants' bankruptcy filings, the case had been stayed as to each defendant for several months (see Docs. 29, 35, 46, 48).

defaults (id.).  The defendants, however, did not file an opposition to the plaintiff's motion for sanctions, either.

In the interim, the court received notice that Donahue had died. Consequently, the personal representative of his estate was substituted as a defendant (Docs. 56, 59, 64, 69).  The defendant was informed that an estate cannot appear pro se and, therefore, the personal representative of the estate was directed to retain counsel (see Doc. 59).  Additionally, counsel for Express moved to withdraw from the case (Doc. 62).  The corporate defendant had also been informed that it cannot proceed pro se (see Doc. 48).

On June 30, 2010, a hearing was held regarding outstanding motions and the status of the case (see Doc. 68).  An Express representative stated that Express was operational, and that Express intended to retain new counsel.  Consequently, corporate defense counsel was permitted to withdraw, and the defendants were given twenty days to obtain new counsel (Doc. 69).  Further, the defendants were afforded another thirty days to comply with the previous court Order to produce discovery, and I deferred ruling on the plaintiff's motion for sanctions pending retention of new counsel (id.).  However, the defendants were cautioned that, if they did not

obtain new counsel by the deadline, the motion for sanctions would be granted, as neither party may appear pro se.[3]

Despite my admonition, the defendants did not retain new counsel, or seek leave for additional time to do so. Further, neither defendant filed a memorandum in opposition to the motion for sanctions. Consequently, based on the defendants' failure to obtain counsel, their prejudicial refusal to participate in discovery, and their lack of opposition, the plaintiff's motion for sanctions was granted, and the defendants' answers, affirmative defenses, and counterclaims were stricken (Doc. 70).

The plaintiff subsequently filed a Motion for Final Default Judgment (Doc. 71), seeking permanent injunctive relief and an award of $142,370.13 in damages, $41,128.50 in attorneys' fees, and $768.50 in costs (id., p. 8). Neither defendant filed a response to this motion.

The Clerk was subsequently directed to enter defaults against the defendants (Doc. 72; see Docs. 73, 74), and the plaintiff's request for

---

[3]Further, at this hearing, an Express representative stated, in response to my inquiry, that Express continued to produce unauthorized Beef O' Brady's merchandise. Consequently, I admonished him that the unauthorized use of the plaintiff's marks could result in contempt proceedings. At the close of the hearing, the representative asserted that the plaintiff's new CEO had requested Express to produce Beef O' Brady's shirts for him.

damages and injunctive relief was referred to me for a report and recommendation (Doc. 72). In support of the damages award, the plaintiff submitted Express's operating reports from the United States District Court, Middle District of Florida, Bankruptcy Division, which allegedly reflected $142,370.13 in revenues during the infringement period (Doc. 71, p. 6; see Doc. 71-1).

An evidentiary hearing on the plaintiff's damages was held (see Doc. 76). The plaintiff's counsel and the plaintiff's media manager appeared at the hearing. No one appeared on behalf of the defendants, who were noticed of the hearing by United States mail (see Doc. Entry Nov. 5, 2010). I mentioned at the hearing that, if a defendant had appeared and requested a continuance of the hearing to retain counsel, I would have granted that request, as this matter involves a substantial sum in damages (see Doc. 76).

Heather Boggs, the plaintiff's media manager, testified at the hearing. She stated the importance of the Beef O' Brady's marks, explaining that they are the product that the plaintiff sells to its franchisees. She testified that the plaintiff has a $2.9 million advertising budget to promote those

marks, and that there are 232 Beef O' Brady's restaurants in the United States, thereby reflecting the success of the marks.

Boggs testified further that, to insure quality control and that the marks are being used correctly, vendors enter into a trademark agreement, and the plaintiff must give its approval of the vendor's merchandise. Boggs stated that the unauthorized use of the marks could harm the plaintiff, as a lack of quality control could diminish the value of the marks.

The plaintiff argued at the hearing that it was entitled to disgorge Express's profits as damages for the defendants' infringement. Although the defendants failed to produce evidence of Express's revenues, the plaintiff, as indicated, obtained revenue information from Express's bankruptcy court filings.

The plaintiff acknowledged that expenses are also identified in the bankruptcy submissions. However, it argued that, in equity, these alleged expenses (which almost equal revenues) should not offset revenues because it is Express's burden to prove its deductible expenses, and the defendants did not allow the plaintiff to examine them regarding the propriety of these expenses (Doc. 71, p. 6).

At the hearing, it was also discussed that Express's revenues of $142,370.13 included non-infringing sales of other companies' merchandise. Consequently, the plaintiff was directed to review Express's bankruptcy submissions and submit a tally of invoices for sales of infringing Beef O' Brady's merchandise (Docs. 76, 77).

The plaintiff submitted a supplemental memorandum which provides a substantially reduced revenue estimate of $30,742.48 (Doc. 78). The plaintiff states that this sum comprises $13,247.30 in sales of Beef O' Brady's merchandise during the months of January, February, April, and June 2009, and Express's total revenues of $17,495.18, for the months of May and August 2009. The plaintiff explained that it seeks Express's total revenues for the months of May and August 2009 because the bankruptcy submissions for those months do not contain itemized sales invoices from which it can segregate Beef O' Brady merchandise sales. Neither defendant filed an opposition to the supplemental memorandum.

II.

The plaintiff has established the defendants' liability for trademark infringement and false designation of origin under the Lanham Act,

-10-

and Express's liability on the breach of contract claim. In this regard, it is noted that the defendants' "default[s have] not [been] treated as ... absolute confession[s] by the defendant[s] of [their] liability and of the plaintiff's right to recover." Nishimatsu Constr. Co., Ltd. v. Houston Nat. Bank, 515 F.2d 1200, 1206 (5th Cir. 1975). However, by defaulting, the defendants are deemed to have "admit[ted] the plaintiff's well-pleaded allegations of fact" for purposes of liability. Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1307 (11th Cir. 2009). As discussed below, the allegations in the complaint, the affidavits and exhibits in the court file (Docs. 1, 13), and the testimony of Heather Boggs satisfy the elements of the plaintiff's claims for trademark infringement, breach of contract, and false designation of origin under the Lanham Act.

In order to prevail on the claim of trademark infringement, the plaintiff must establish: (1) that it possessed a valid mark, (2) that the defendants used the mark, (3) that the defendants' use of the mark occurred "in commerce," (4) that the defendants used the mark "in connection with the sale ... or advertising of any goods," and (5) that the defendants used the mark

in a manner likely to confuse consumers.  North American Medical Corp. v. Axiom Worldwide Inc., 522 F.3d 1211, 1218 (11th Cir. 2008).

The plaintiff has established that it possesses valid marks by identifying the registration numbers of each mark and providing copies of the marks from the U.S. Patent and Trademark Office's website (see Doc. 13-1, pp. 7-17).  American Heritage Life Ins. Co. v. Heritage Life Ins. Co., 494 F.2d 3, 10 (5th Cir. 1974); 15 U.S.C. 1115(a). Further, the evidence clearly establishes that the defendants used the marks, since they used them under the licensing agreement, and continued to use them after it was terminated.  In fact, as recently as June 30, 2010, a corporate representative stated at a hearing before me that Express was producing Beef O' Brady's merchandise.

Moreover, the plaintiff's evidence of interstate solicitation and internet promotion (see Doc. 1, pp. 21-49; Doc. 13, Exs. 2-5) demonstrates that the marks were used in commerce and in connection with the sale and advertising of goods.  Finally, the plaintiff's well-pled allegations establish a likelihood of confusion, as the marks are strong; the plaintiff and the defendants were using the same marks; the products are the same; the customers appear to be the same; the sales and advertising methods are

similar; and the defendants' intent seems to be to take advantage of the plaintiff's marks.  See Alliance Metals, Inc., of Atlanta v. Hinely Industries. Inc., 222 F.3d 895, 907 (11th Cir. 2000).

These factual allegations, moreover, also establish the plaintiff's claim of false designation of origin under the Lanham Act.  See Babbit Electronics, Inc. v. Dynascan Corp., 38 F.3d 1161, 1181 (11th Cir. 1994)(facts enabling a party to prevail under §1114(a)(1) will result in recovery pursuant to §1125).

Finally, to establish Express's liability for breach of contract, Florida law requires the plaintiff to establish (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach.  Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1272 (11th Cir. 2009).[4] The well-pled allegations show the existence of a valid Supplier Trademark Licensing Agreement, which Express violated by continuing to sell Beef O' Brady's merchandise after the termination of the agreement, thereby resulting in damage to the plaintiff (See Docs. 1, 13).  Accordingly, it is appropriate to enter final judgment as to liability on the plaintiff's claims of trademark

---

[4]The Supplier Trademark Licensing Agreement provides that the Agreement is to be construed in accordance with Florida law (Doc. 1, p. 17, ¶10d).

infringement, breach of contract, and false designation of origin in violation of the Lanham Act.  See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., supra. 561 F.3d at 1307.

### III.

The plaintiff seeks the entry of a permanent injunction and monetary relief in the form of the corporate defendant's profits, attorneys' fees, and costs (Docs. 71, 78).  The Lanham Act provides that a successful plaintiff may recover (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the cost of the action.   15 U.S.C. 1117(a).  Furthermore, in an exceptional case, the court may award reasonable attorneys' fees. Id.

### A. Defendant's profits

The plaintiff requests an award of $30,742.48, based on Express's profits (Doc. 78, p. 2).  A plaintiff is entitled to a defendant's profits when: "(1) the defendant's conduct was willful and deliberate. (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct." Optimum Techs., Inc. v. Home Depot U.S.A., Inc., 217 Fed. Appx. 899, 902 (11th Cir. 2007)(unpub. dec.).

An award of profits is justified in this case for all of those reasons. Thus, the defendants were unjustly enriched by sales of infringing merchandise, and even the filing of a lawsuit was insufficient to stop their unlawful conduct.   Moreover, the defendants' conduct was willful, as evidenced by Donahue cautioning a franchisee manager to keep "quiet" about Donahue's solicitation of orders of Beef O' Brady merchandise, and telling another franchisee who challenged his authority to sell Beef O' Brady's merchandise that he would continue to do so "no matter what" (Doc. 13-2, pp. 8-14). See Optimum Techs., Inc. v. Home Depot U.S.A., Inc., supra, 217 Fed. Appx. at 903 (A willful violation of a trademark occurs when the infringer "knowingly and deliberately cash[es] in upon the good will of the infringed.").

As indicated, the plaintiff seeks to disgorge profits of $30,742.48 (Doc. 78, p. 2). "In assessing profits the plaintiff shall be required to prove defendant's sales only; [the] defendant must prove all elements of cost or deduction claimed." 15 U.S.C. 1117(a). Furthermore, "Lanham Act damages may be awarded even when they are not susceptible to precise calculations." Aronowitz v. Health-Chem Corp., 513 F.3d 1229, 1241 (11th Cir. 2008).

Thus, all monetary awards under Section 1117 are "subject to the principles of equity," and judgment may be entered "for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. 1117.

The plaintiff has satisfied its burden by presenting evidence of Express's revenues during the period of infringement (see Doc. 71-1).[5] Thus, the plaintiff asserts that the bankruptcy reports reflect sales of Beef O' Brady's merchandise totaling $13,247.30 for the months of January, February, April, and June 2009 (Doc. 78, p. 2). Additionally, it represents that the bankruptcy reports show Express's total revenues for the months of May and August 2009 were $17,495.18 (id.), for a sum of $30,742.48.[6]

As indicated, that the plaintiff was unable to segregate the sales of Beef O' Brady's merchandise from non-infringing merchandise for May and August 2009 because the bankruptcy submissions do not contain itemized sales lists for those months (see id.). In this circumstance, it is appropriate to

---

[5] According to the plaintiff, the alleged infringement began on January 1, 2009, and continued into 2010 (Doc. 78, p. 2). This assertion is unchallenged by the defendants. The plaintiff does not, however, seek recovery of Express's revenues for the months of March and July 2009. The bankruptcy submissions do not appear to contain a revenue report for July 2009.

[6] Assuming that there are any potential challenges to these computations, the defendants have waived them by failing to raise them.

accept Express's total revenues for these two months because it is "the infringer's burden to prove ... which, if any of those [gross] sales were not attributable to the wrongful act." McCarthy on Trademarks and Unfair Competition, Fourth Ed., §30:66; see also Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 64 (1st Cir. 2008), cert. denied, 129 S.Ct. 1622 (2009)(infringer's burden to show gross sales identified by the plaintiff were unrelated to the infringement). In this regard, the Supreme Court stated: "There may well be a windfall to the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer." Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 207 (1942); see also Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 262 (1916)(when there is difficulty ascertaining what proportion of profit is due to trademark infringement, "it is more consonant with reason and justice that the owner of the trademark should have the whole profit than that he should be deprived of any part of it by the fraudulent act of the defendant."). In this case, the defendants have not even attempted to meet their burden of proving non-infringing sales. Further, the plaintiff's attempt to segregate infringing

sales for the months of May and August 2009 failed because the defendants had not produced sales information, in defiance of this court's order (Doc. 55). Accordingly, it is recommended that Express's total revenues for those months be considered in calculating its profits.

Next the court determines what, if any, costs or expenses are properly deducted from the defendants' revenues of $30,742.48. 15 U.S.C. 1117(a). As indicated, the defendants proffered no evidence or argument concerning their deductible costs and expenses. When "the infringer fails to carry its statutory burden to offer evidence of deductions, the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales." WMS Gaming, Inc. v. WPC Prods. Ltd., 542 F.3d 601, 609 (7th Cir. 2008); see also Tiramisu Intern. LLC v. Clever Imports LLC, 2010 WL 3199718 at *8 (S.D. Fla. 2010).

Although Express's bankruptcy reports identify corporate expenses, the plaintiff requests that, in equity, they be disregarded because the defendants precluded the plaintiff from cross-examining them regarding the propriety of those expenses (Doc. 71, p. 6). The sum of the expenses listed in the bankruptcy reports are substantially in excess of $100,000, so

that if this figure were accepted, the plaintiff would not be awarded any profits.

It is clear that the bankruptcy reports are a grossly inaccurate estimate of Express's deductible expenses because, among other deficiencies, the costs related to the Beef O' Brady's merchandise are not discernable from the reports. See Maltina Corp. v. Cawy Bottling Co., Inc., 613 F.2d 582, 586 (5th Cir. 1980)(the defendants may deduct only those costs that are "actually related" to the sale of the infringing products); Abbott Laboratories v. Unlimited Beverages, Inc., 218 F.3d 1238, 1242 (11th Cir. 2000)(disallowing deduction of overhead costs that would have been incurred without the sale of the infringing product). Furthermore, there are numerous expenses that are not properly identified; thus, Express includes as expenses checks written to various payees without explanation (see Doc. 71-1).[7]

Although I considered reducing the revenue award by a percentage to account for Express's expenses. I have no way of determining an appropriate reduction, and if there is a windfall to be had in this case, it is

---

Additionally, the trustworthiness of the expenses is highly questionable. as the handwritten documentation suggests that the bankruptcy reports were completed by the defendants, who had a personal interest in maximizing the company's expenses.

preferable that the plaintiff, rather than the defendants, receive this benefit. See Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., supra, 316 U.S. at 207. Therefore, due to the defendants' failure to meet its burden of proving deductible expenses, it is appropriate to reject the bankruptcy expense reports, and award the plaintiff as profits Express's revenues during the period of infringement. See Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 176-77 (3rd Cir. 2005)(rejecting summary of expenses as lacking sufficient detail, trustworthiness, and uncertainty as to the amount of expenses attributable to the infringing product); McCarthy on Trademarks and Unfair Competition, Fourth Ed., §30:66 ("The infringer's burden of proving deductible costs is not carried by records showing only a vague, undifferentiated category of 'overhead' or 'checks written.' When the burden is not carried, plaintiff is awarded all revenue for that year."). Accordingly, I recommend that the plaintiff be awarded $30,742.48, which reflects Express's revenues during the period of infringement.

Moreover, I recommend that the defendants be held jointly and severally liable for this sum (Doc. 82). It is clear that Donahue's active and knowing infringement of the plaintiff's marks makes his estate personally

-20-

liable for trademark infringement.  See Chanel, Inc. v. Italian Activewear of Florida, Inc.. 931 F.2d 1472, 1477 (11th Cir. 1991); Mead Johnson & Co. v. Baby's Formula Service, Inc., 402 F.2d 19, 23 (5th Cir. 1968).  However, as the plaintiff acknowledges (Doc. 82), personal liability does not automatically extend to another defendant's profits.  Legal authority, primarily in the context of copyright infringement, holds that, generally, each defendant is severally liable for his own illegal profit.  Frank Music Corp. v. Metro-Goldwyn Mayer,Inc., 772 F.2d 505, 519 (9th Cir. 1985); Nelson-Salabes, Inc. v. Morningside Development, LLC, 284 F.3d 505, 517 (4th Cir. 2002).

However, joint and several liability does extend to a defendant's profits where, as here, the corporate defendant was closely held by the individual defendant who was engaging in the infringing conduct.  See Nelson-Salabes, Inc. v. Morningside Development, LLC, supra, 284 F.3d at 517 (long-standing exception to the rule that defendants are not jointly liable for profits is when the defendants act as partners or as "practical partners"); Frank Music Corp. v. Metro-Goldwyn Mayer, Inc., supra, 772 F.2d at 519; see, e.g., Babbit Electronics, Inc. v. Dynascan Corp., supra, 38 F.3d at 1183-84 (in a trademark infringement case, individual defendants were jointly and

personally liable with their corporation for all relief, which included corporate profits, because they "authorized, directed, and participated in the infringement"); Belford, Clarke & Co. v. Scribner, 144 U.S. 488, 507 (1892) (printer was jointly liable for publisher's profits from infringing book because printer and publisher were "practical partners"). Accordingly, it is recommended that the estate of Richard Donahue be held jointly and severally liable for the award of Express's profits.

### B. Attorneys' fees

The plaintiff also seeks an award of attorneys' fees of $41,128.50 (Doc. 71). Pursuant to 15 U.S.C. 1117(a), "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." For the purposes of the statute, "exceptional cases" are those that involve conduct that is "malicious, fraudulent, deliberate, and willful," or in which "evidence of fraud or bad faith" exists. Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.,

253 F.3d 1332, 1335-36 (11th Cir. 2001).[8] Thus, a high degree of culpability on the part of the infringer is necessary to justify an award of attorneys' fees.

In its motion, the plaintiff argued that the defendants' defaults qualify this case as an exceptional one warranting a fee award (Doc. 71, pp. 5-6). The defendants' defaults, in themselves, do not strike me as an exceptional circumstance warranting attorneys' fees. However, the plaintiff argued persuasively at the hearing, and in its supplemental memorandum, that the "[d]efendants' use of Plaintiff's marks after the termination of the Supplier License, dilatory conduct throughout the litigation, and continued use of the trademarks after the filing of the complaint and entry of the preliminary injunction[] is the deliberate or willful conduct necessary warranting the finding of an exceptional case" (Doc. 78, p. 1, n.1).

Thus, the undisputed evidence shows that, after the defendants received notice that they were no longer authorized to use the plaintiff's

---

[8]There is also Eleventh Circuit caselaw stating that exceptional cases are those where the infringing party acts in a "malicious, fraudulent, deliberate, or willful manner." Burger King Corp. v. Pilgrim's Pride Corp., 15 F.3d 166, 168 (11th Cir. 1994)(emphasis added)(internal quotations omitted). That standard is advocated by the plaintiff (Doc. 78, p. 1, n.1). It is not necessary to determine which is the appropriate standard because the defendants are liable under either one.

marks, the defendants continued to advertise and sell merchandise bearing the plaintiff's marks, including Donahue's active solicitation of infringing sales by telephoning franchisees seeking orders (Doc. 13-2).   Further, after the termination of the licensing agreement, the defendants fraudulently represented to the public on Express's website that it was "The Beef 'O' Brady's online Store" and "[a]n approved licensee of Beef O' Brady marks" (see Doc. 1, pp. 21-25).

There is, moreover, undisputed evidence of continued unauthorized use of the marks even after the defendants were served with this lawsuit (see Doc. 13-1, pp. 48-52).  In fact, as recently as June 2010, an Express representative stated at a hearing before me that Express was producing merchandise with the plaintiff's marks. The defendants' continued use of the marks after receiving notice of their infringement supports a finding of willfulness.  See, e.g., PetMed Express, Inc. v. MedPets.com, Inc., 336 F.Supp.2d 1213, 1222 (S.D. Fla. 2004).

The defendants' wanton disregard for the plaintiff's rights is exemplified in two of Donahue's telephone solicitations.  Thus, when soliciting orders of Beef O' Brady's merchandise, Donahue told a franchisee

manager "to keep our communication quiet," ostensibly so that the plaintiff's corporate office would not find out about the solicitation. Further, Donahue commented to a franchisee that he would continue to sell merchandise with the Beef O' Brady trademarks "no matter what," when the franchisee said to Donahue that he was not authorized to sell Beef O' Brady's merchandise (Doc. 13-2, pp. 9, 11). See Arista Records, Inc. v. Beker Enter., Inc., 298 F.Supp.2d 1310, 1312 (S.D. Fla. 2003)(defining willful infringement "as when the infringer acted with actual knowledge or reckless disregard for whether its conduct infringed upon the plaintiff's copyright").

Moreover, the defendants' conduct in this litigation, including their refusal to participate in discovery and disregard of court orders, also evidences a willful disregard for the plaintiff's rights and this court's authority. See Tiramisu Intern. LLC v. Clever Imports LLC, supra, 2010 WL 3199718 at *7. Significantly, the defendants have not filed a response to this motion and, therefore, they have put forth no argument whatsoever in opposition to an award of attorneys' fees.

In sum, the undisputed evidence shows that the defendants deliberately, willfully, and maliciously infringed the plaintiff's marks. This

misconduct, and the defendants' obfuscation in this litigation, qualifies this as an exceptional case that warrants an award of attorneys' fees against the defendants. Accordingly, I recommend that the plaintiff be awarded its reasonable attorneys' fees. See 15 U.S.C. 1117(a).

The plaintiff seeks attorneys' fees totaling $41,128.50, which comprises 170 hours of work performed in this case by five attorneys, with hourly rates ranging from $222 to $400 (Doc. 71-3, p. 2). In support of this request, the plaintiff proffers a detailed time record and an affidavit from Zachary D. Messa, an attorney in this matter, which opines that the total fee sought is "reasonable and customary" for intellectual property litigation in Hillsborough County (id., ¶5).

The lodestar approach is properly applied to determine a fee award under the Lanham Act. Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc., supra, 253 F.3d at 1336. The lodestar is "calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." Blum v. Stenson, 465 U.S. 886, 888 (1984). This "lodestar" may then be adjusted upward or downward based on other considerations, such as the results obtained and the quality of representation. Id.; Loranger

v. Stierheim, 10 F.3d 776, 781 (11th Cir. 1994). "The fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates." Norman v. Housing Authority of Montgomery, 836 F.2d 1292, 1303 (11th Cir. 1988).

      1. Hourly Rates.

      A first step in the computation of the lodestar is determining the reasonable hourly rate. The prevailing market rate for similar services by similarly trained and experienced lawyers in the relevant legal community is the established basis for determining a reasonable hourly rate. Duckworth v. Whisenant, 97 F.3d 1393, 1396 (11th Cir. 1996).

      The party seeking fees bears the burden of establishing the market rate and should present the court with "specific and detailed evidence" from which it can determine the reasonableness of the proposed rate. Norman v. Housing Authority of Montgomery, supra, 836 F.2d at 1303. An applicant may meet this burden by producing either direct evidence of rates charged under similar circumstances, or opinion evidence of reasonable rates based on the attorney's skill and experience. Id. at 1299. In addition, the court

may use its own expertise and judgment to make an appropriate independent assessment of the value of an attorney's services. Id. at 1303.

The plaintiff requests the following hourly rates and compensation for its counsel:

| Attorney | Hourly Rates | No. of Hours | Total |
|---|---|---|---|
| Angelina Lim | $295 | 30.1 | $ 8,879.50 |
| Zachary Messa | $225 | 110.2 | $24,795.00 |
| Sara Schifino | $222 | 25 | $ 5,550.00 |
| Peter Rivellini | $320 | .2 | $     64.00 |
| Frank Jakes | $400 | 4.6 | $ 1,840.00 |

However, with the exception of attorney Messa, the plaintiff has patently failed to meet its burden to establish the reasonableness of these hourly rates. Thus, the plaintiff did not proffer opinion evidence as to the reasonableness of these hourly rates, or state the hourly rates charged by comparably experienced attorneys. Furthermore, with the exception of attorney Messa, the plaintiff has not even identified the legal experience of these attorneys, so that the court lacks record evidence from which it can independently determine the reasonableness of the requested rates.

With regard to attorney Messa, the affidavit indicates that he has practiced law in Florida since September 2001, and that intellectual property law is the focus of his practice (Doc. 71-3, p. 1). His hourly rate, in the court's experience, is not unreasonable and, in the absence of a specific challenge by the defendants, it is recommended that this hourly rate be accepted.

On the other hand, the plaintiff presented no evidence to establish the reasonableness of the hourly rates of the other attorneys. This is especially problematic with regard to hourly rates near and above $300, which I consider to be high hourly rates that I do not grant as a matter of course in a non-complex case such as this one.

Consequently, due to the plaintiff's failure to meet its burden to show the reasonableness of the hourly rates, I recommend that those rates be reduced. See, e.g., Demers v. Adams Home of Northwest Florida, Inc., 321 Fed. Appx. 847 (11th Cir. 2009)(unpub. dec.)(the district court did not err when it reduced fees because, among other problems, the applicant failed to present evidence as to reasonable rates). Since no other information concerning the attorneys has been provided, the requested rates would

provide at least some indication of their skill and experience. However, the requested rates should be reduced to rates that are indisputably reasonable. Thus, I recommend that plaintiff's counsel be awarded the following hourly rates:

| Attorney | Hourly Rates |
|---|---|
| Angelina Lim | $250 (down from $295) |
| Zachary Messa | $225 |
| Sara Schifino | $222 |
| Peter Rivellini | $275 (down from $320) |
| Frank Jakes | $300 (down from $400) |

As will be seen, these three rate reductions only diminish the attorneys' fees award by $1,823.50.

>           2.      Reasonableness of the Number of Hours Expended.

The next step in the lodestar analysis is to determine what hours were reasonably expended on the litigation. In calculating this sum, the court should exclude excessive, unnecessary and redundant hours. Duckworth v. Whisenant. supra, 97 F.3d at 1397. Further, if an applicant's documentation

"is inadequate, the district court may reduce the award accordingly." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

Additionally, "'[o]bjections and proof from fee opponents concerning hours that should be excluded must be specific and 'reasonably precise.'" American Civil Liberties Union of Georgia v. Barnes, 168 F.3d 423, 428 (11th Cir. 1999); see also Norman v. Housing Authority of Montgomery, supra, 836 F.2d at 1301. Accordingly, a fee opponent's failure to explain exactly which hours he views as unnecessary or duplicative is generally viewed as fatal. See Gray v. Lockheed Aeronautical Systems Co., 125 F.3d 1387, 1389 (11th Cir. 1997).

As indicated, the plaintiff seeks recovery for 170.1 hours of attorney work on this case. The amount of hours expended on this matter appears high, considering that this is not a complex matter and, in great part, is unchallenged by the defendants. On the other hand, the plaintiff aptly notes that the defendants' dilatory conduct during the litigation and the defendants' bankruptcy filings were unique circumstances that increased the time expenditures in this matter (Doc. 71, p. 6, n.2). Further, the plaintiff included a detailed time report which specifies the legal services provided in this case

and the time spent on each of these tasks (Doc. 71-3), none of which appear patently unreasonable. Moreover, the defendants have not asserted any objections to counsel's time entries. See American Civil Liberties Union of Georgia v. Barnes, supra, 168 F.3d at 428. Therefore, I recommend that the plaintiff's claim of 170.1 hours be accepted. Gray v. Lockheed Aeronautical Systems Co., supra.

This results in a lodestar of $39,305.00, as detailed below:

| Attorney | Hourly Rates | No. of Hours | Total |
|---|---|---|---|
| Angelina Lim | $250 | 30.1 | $ 7,525.00 |
| Zachary Messa | $225 | 110.2 | $24,795.00 |
| Sara Schifino | $222 | 25 | $ 5,550.00 |
| Peter Rivellini | $275 | .2 | $ 55.00 |
| Frank Jakes | $300 | 4.6 | $ 1,380.00 |
| | | Total: | $39,305.00 |

### 3. Adjustment to the Lodestar

After the lodestar is determined, the court must next consider the necessity of an adjustment for results obtained. Norman v. Housing Authority of City of Montgomery, supra, 836 F.2d at 1302. The plaintiff does not

request an adjustment to the lodestar, or identify any circumstances which justify an upward adjustment to this lodestar. Accordingly, I recommend that the plaintiff be awarded a reasonable attorneys' fee totaling $39,305.00.

C. Costs

The plaintiff also seeks recovery of costs totaling $786.50 (Doc. 71-3, p. 2). In support of this request, the plaintiff provides an expense report which lists $1,626.63 of compensable and non-compensable expenses, without specifying which of these costs it seeks to recover (see id., pp. 2. 19).

Under 15 U.S.C. 1117, a prevailing plaintiff "shall be entitled ... to recover ... the cost of the action." The term "costs of the action" is not defined by the Lanham Act. However, as the Fourth Circuit discusses in People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 370-71 (4th Cir. 2001), this term generally means those costs defined in 28 U.S.C. 1920. See, e.g., Rib City Group, Inc. v. RCC Restaurant Corp., 2010 WL 4739493 at * 2 (M.D. Fla. 2010)(unpub. dec.)(denying costs sought under § 1117 that are not recoverable under § 1920); Tiramisu Intern. LLC v. Clever Imports LLC, supra, 2010 WL 3199718 at *16 (denying as non-compensable costs under § 1920 telephone calls, courier service charges, postage, computer

research charges). The plaintiff does not argue otherwise. To the contrary, by seeking only a portion of its expenses, the plaintiff implicitly acknowledges that it is not entitled to recover all of these expenses.

Pursuant to 28 U.S.C. 1920, a prevailing party may recover: (1) fees of the clerk and marshal; (2) fees for transcripts necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and copies of papers necessarily obtained for use in the case; (5) docket fees under §1923 of this title; (6) compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under §1828 of this title.

A review of the plaintiff's expense report reflects that the plaintiff has incurred compensable expenses totaling $560. Thus, the plaintiff is entitled to reimbursement of the filing fee of $350, see 28 U.S.C. 1914(a), and service-related fees totaling $210 (see Doc. 71-3, p. 19). Although the expense report also lists a charge of $161 for "photocopies," the statute permits recovery only for those photocopies that are necessarily obtained for use in the case, and there has been no such showing with regard to this expense. Therefore, this cost should be rejected. See, e.g., Tony Jones

<u>Apparel, Inc.</u> v. <u>Indigo USA LLC</u>, 2005 WL 3115234 at *4 (N.D. Ill. 2005)

(unpub. dec.)(disallowing photocopy costs under § 1117 because there was no

showing as to the necessity of the copies). Accordingly, I recommend that the

plaintiff be awarded costs totaling $560.

### D. <u>Permanent injunction</u>

Finally, the plaintiff requests that the court make permanent the

preliminary injunction entered in this case (Doc. 71, pp. 6-7; <u>see</u> Doc. 39).

"Federal courts may grant permanent injunctions where infringement is found

to have occurred in order to prevent further infringing use of a mark."

<u>Aronowitz</u> v. <u>Health-Chem Corp.</u>, <u>supra</u>, 513 F.3d at 1242.

A plaintiff seeking a permanent injunction must demonstrate (1)

it has suffered an irreparable injury; (2) remedies available at law, such as

monetary damages, are inadequate to compensate for that injury; (3)

considering the balance of hardships between the plaintiff and defendant, a

remedy in equity is warranted; and (4) the public interest would not be

disserved by a permanent injunction. <u>Angel Flight of Ga., Inc.</u> v. <u>Angel</u>

<u>Flight America, Inc.</u>, 522 F.3d 1200, 1208 (11th Cir. 2008).

As discussed in the report and recommendation for the entry of the preliminary injunction (Doc. 23, pp. 10-11), and reiterated in the testimony of the plaintiff's media manager, Heather Boggs, the defendants' unauthorized use of the plaintiff's marks absent the plaintiff's quality control oversight presents a clear threat of irreparable harm to the plaintiff's name and goodwill. Further, given the conduct of the defendants to date in this action, it is clear that, absent this injunction, the corporate defendant, or individuals associated with it, are liable to continue to infringe the plaintiff's marks. The continuing infringement is exemplified by the admission of a corporate representative at a June 30, 2010, hearing that Express continues to produce apparel with the Beef O' Brady's marks.

The last two factors, the balance of hardships between the plaintiff and defendants, and the public interest, also favor the entry of a permanent injunction. Thus, the defendants have presented no basis upon which to conclude that the balance of hardships favors them. Moreover, the entry of a permanent injunction under these circumstances supports the public interest of avoiding unnecessary confusion. See Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., supra, 522 F.3d at 1209. Accordingly, I recommend

the entry of a permanent injunction against the defendants, consistent with the form of the preliminary injunction entered in this case (Doc. 39).

## IV.

For the foregoing reasons, I recommend that the Motion for Final Default Judgment (Doc. 71) be granted to the extent that final judgment be entered for the plaintiff on its claims of trademark infringement, false designation of origin, and breach of contract, in the amount of $30,742.48, plus attorneys' fees of $39,305, and costs of $560, with interest thereon in accordance with 28 U.S.C. 1961. I further recommend that the preliminary injunction be made permanent.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: FEBRUARY 28, 2011

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the

-37-

date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).